IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SLOAN HAMIL, et al., | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | )   CIVIL ACTION No. 22-00366-KD-B |
| | ) |
| ACTS RETIREMENT-LIFE | ) |
| COMMUNITIES INC., et al., | ) |
|     Defendants. | ) |

**ORDER**

This action is before the Court on cross motions for summary judgment. (Docs 94 and 96). The plaintiffs are former employees Acts Retirement-Life Communities, Inc. ("Acts"), specifically they worked in the skilled nursing unit at Westminster Village in Spanish Fort, AL. Plaintiffs were terminated when they failed to receive a COVID-19 vaccination as required by their employer. Plaintiffs claim that Acts discriminated against them based on their religious belief that they should not receive the COVID-19 vaccination. Acts moves for summary judgment claiming, inter alia, it is a religious organization that is exempt from the religious discrimination claims of the plaintiffs. The Court agrees.

Acts is a 501(c)(3) that provides retirement age individuals housing and care depending on their needs. Acts provides independent living, assisted living and skilled nursing units. Acts began in Fort Washington, Pennsylvania as a ministry of the Church of the Open Door. Acts' original name was Open Door Estates.

Acts now provides its services in several locations across the United States. Acts is no longer directly associated with the Church of the Open Door. However, Acts claims to continue its Christian mission. Acts bylaws include a doctrinal statement that reads:

    The Corporation shall subscribe to the Holy Scriptures -- both the Old and New

1

Testaments--as its only rule of faith and practice, and adhere to the Historical Christianity and the conservative doctrines taught in the Scriptures and further expressed in the Apostles' Creed:

> I believe in God the Father Almighty, Maker of heaven and earth and in Jesus Christ, His only Son, our Lord, who was conceived by the Holy Ghost, born of the Virgin Mary, suffered under Pontius Pilate, was crucified, died and was buried; He descended into hell; the third day He arose from the dead; He ascended into heaven, and sitteth on the right hand of God the Father Almighty; from thence He shall come to judge the quick and the dead. I believe in the Holy Ghost, the holy catholic church, the communion of saints, the forgiveness of sins, the resurrection of the body and life everlasting. Amen.

(Doc. 98-4). The bylaws also require Acts' Board of Directors to fully support the doctrinal statement and live their lives in accordance with the Bible.[1] Acts includes a time of prayer during each board meeting.

Acts Mission Statement reads:

---

[1] Plaintiffs object to the excerpt of the bylaws as not having proper foundation. In response, Defendants attached to its Reply the excerpt from the bylaws and a declaration by Jeremy Neely, Senior Vice President of Operations and Chief Community Operations Officer, as an authenticating witness to the excerpt. Plaintiffs then moved to strike Acts' Declaration and the substantive information, i.e. the excerpt from the bylaws. (Doc. 112). Plaintiffs claim that neither the "substantive information contained in his declaration", nor Jeremy Neely's name as a witness was given to them during the litigation of this case. (Id.).

Federal Rule of Civil Procedure 37(c)(1) states: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37 (c)(1). Plaintiffs have not met their burden to show that the information or the authenticating witness was not disclosed. On September 2, 2024, Acts filed served its Second Supplemental Disclosures. (Doc. 63). In the disclosures, Acts served notice of potential future use of "witnesses needed to authenticate documents." (Doc. 115-1 at p. 5, ¶ A. 12.). Although he is not specifically named, Jeremy Neely falls into this category as his declaration only authenticated the excerpts from Acts' bylaws. The disclosures also included a "description by category" of documents that may be used to support its Acts' "claims or defenses" as "[a]ny documents pertaining to Defendants' status as religious organizations exempting them from claims of religious discrimination, including failure to accommodate, under Title VII." (Doc. 115-1 at p. 6, ¶ B. 15.). While not specifically naming Acts' bylaws as a part of this category, the description of the information is an adequate disclosure that Acts possessed documents to be used to support its argument for the Title VII exemption for religious organizations. Therefore, Plaintiffs' Motion to Strike is **DENIED.**

> Acts is committed to providing security and peace of mind to seniors by being a preeminent provider of retirement-life services, responsive to individual, social, personal, health, and spiritual needs in a Christian atmosphere graced with Loving-Kindness, dignity, sensitivity, honesty, and respect without prejudice or preference.

(Doc. 98-3 at p. 3).

Acts also has a "Loving-Kindness Statement" that declares:

> The Acts Culture of Loving-Kindness is based on the extension of God's grace, goodness, mercy, and love without prejudice to others. Acts embraces Loving-Kindness, recognizing the inherent value in others through an attitude of respect and acceptance, without favor. Acts is committed to following God's directives to care for seniors and, in so doing, glorifying Him through intent, purpose and righteous justice.

(Id.).

According to Acts, the name Acts was derived from the Book of Acts, a book in the New Testament of the Bible. Specifically, Acts finds its mission in Acts 6:1-6 wherein seven men that were filled with the holy spirit and wisdom were ordained to care for widows.

Acts also has a chaplain at each location that provides spiritual counseling and conducts worship services and Bible studies. All chaplains are under the leadership of the Corporate Director of Spiritual Development for Acts. The Corporate Director of Spiritual Development is required to have a Master of Divinity or a similar degree from a seminary and provides pastoral care to Acts' employees.

This action arises out of Acts' Westminster Village ("Westminster") in Spanish Fort, Alabama. The plaintiffs were employees in the skilled nursing unit during the COVID-19 pandemic. As was common in nursing homes, Acts had residents that were hospitalized with the virus or died from the virus. In response to the pandemic, Acts put together a Clinical Task Force. The members of this task force were Acts' President Karen Christiansen, Chief Human Resources Officer Deidre Groenen, Vice President and Chief Medical Director Dr. Paul Reinbold, and Senior Vice President and Chief Clinical Officer Holly Schade. The Clinical Task

Force met twice each day and was focused on providing the care and protection for the residents and following the guidelines set out by local and federal government authorities.

Once the COVID-19 vaccine rollout began, nursing home employees and patients were among those who were first eligible to receive the vaccine. Acts sent out a letter to its employees in July 2021 stating that receiving the vaccine would be required by November 1, 2021.

Acts also provided a process for employees to request exemption. To review religious exemption requests for the vaccine, Acts formed a committee that was led by Iain Crichton, the Corporate Director of Spiritual Development. At first, the religious exemption requests were granted generously. However, Crichton noticed the religious exemption requests contained references or quotes from the Bible that he did not believe were applicable to the vaccine exemption. Also, Crichton believed that the exemption requests were often based on science or health reasons, rather than religious beliefs. Thereafter requests based on health reasons or that were determined to not be based on applicable biblical references were denied and previous exemptions were rescinded.

Plaintiff Sloan Hamil worked as a speech pathologist at WillowBrooke Court – the skilled nursing area of Westminster. As a speech pathologist, Hamil worked directly with the patients to help them improve their speech and language difficulties. Hamil first requested a religious exemption for the COVID-19 vaccine on August 19, 2021. Hamil's request stated that she believed her body is a temple for God and it is her God-given responsibility to protect the physical integrity of her body. Hamil believed that the vaccine would be similar to eating "unclean food" and would go against her conscience. Hamil was also concerned about the potential harm it could cause to fertility. Hamil states that this conclusion was based on prayer, consultation with her doctors and conversations with people at her church.

Hamil's first religious exemption request was denied. Acts cited the fact she previously received the flu vaccine. Acts gave Hamil the chance to explain her views considering that she received the flu vaccine. Hamil's response contained no religious discussion other than a mention of discussing whether to take the COVID-19 vaccine with her fellow church members. Rather Hamil's second request discussed the medical research of the flu vaccine and the chemical makeup of the different COVID-19 vaccines. Hamil's second request was denied because Acts determined that her objection was not based on religious belief. Hamil then requested approval again based on her medical status. The record is unclear, but apparently Acts did not act on this request or it was denied.

Hamil then submitted a formal appeal letter. In this appeal letter, she repeated her belief that her body is a temple and that by putting the vaccine in her body when it was not sick would be destructive to that temple. Hamil also asked Plaintiff Howerin for Bible verses she could use on her third religious exemption request, since Howerin's religious exemption request was approved. Again, the record is unclear whether Acts responded to the appeal or request. However, Hamil's employment with Acts was terminated in late 2021. This termination followed two letters from Acts informing her she must start her vaccination process by November 1st, or she would be on inactive status, and after 30 days would be terminated from employment.

Plaintiff Jennifer Sigley first began working for Acts as a part-time employee at Acts' Pensacola, Florida community in 2016. Sigley later transferred to Westminster to work in WillowBrooke Court as a nurse. Sigley became the Assistant Director of Nursing in February 2021. Sigley provided treatment and care to the residents daily. She worked in the COVID-19 unit. In Sigley's initial religious exemption request, she did not describe her religious beliefs nor

her religious reasoning for requesting an exemption to the vaccine. Rather, Sigley simply cited some Bible verses in her request. Acts denied the request and cited the fact that Sigley received the flu vaccine the year prior.

Sigley then filed another religious exemption request that included a statement of her beliefs to support her request. Sigley stated that her religious beliefs are a part of her daily life choices and she believed she should not take the COVID-19 vaccine because it goes against those beliefs. Sigley stated that she has resisted taking influenza vaccines in the past and only started receiving them when Acts strongly advised it. Sigley also stated that she believes the immune system is created by God and she objects to any medical intervention to modify it.

Sigley's request was initially granted, as it was during the time frame when Acts was liberally granting requests. On October 7, 2021, Acts sent Sigley a letter rescinding the approval for the religious exemption request to the COVID-19 vaccine. The letter extended the deadline to start the vaccine process to November 1, 2021. The letter informed Sigley that failure to comply would result in her being placed on inactive status and after 30 days of inactive status, Sigley's employment with Acts would end. Sigley received a letter from Acts with a similar message on October 22, 2021. Sigley was terminated after she did not receive the vaccine.

At deposition, Sigley further explained her views on the COVID-19 vaccine. Sigley testified she is not "anti-vaxxer" but skeptical of vaccines in general, and not for necessarily religious reasons. Sigley was also opposed to the COVID-19 vaccine because of the side effects and the fact that her father-in-law passed away soon after receiving the second dose of the vaccine. Sigley states that she was terminated before she could decide whether to get the COVID-19 vaccination.

Plaintiff Tina Wolfe began working at Westminster as a part-time nurse. Wolfe was promoted to full-time Resident Nurse Supervisor in March 2021. Wolfe treated the needs of patients each day and worked closely with Plaintiff Sigley. Wolfe submitted her first religious exemption vaccine request August 23, 2021. This request quoted some Bible verses, explained that she believes in the Bible and holds a strong belief against vaccines generally, but the request did not detail any religious reasoning behind her exemption request. Acts denied her request and cited the fact that Wolfe received the flu vaccine the year prior.

Wolfe then submitted a new letter requesting exemption. Her request stated that she felt bullied into getting the flu vaccine and that she put her trust in God. Wolfe then quoted Bible verses about not giving into fear. Acts initially granted her request but then sent Wolfe the same letter as Plaintiff Sigley rescinding the approval of the religious exemption request for the COVID-19 vaccine. The October 7, 2021 letter urged Wolfe to begin the vaccination process by November 1, 2021 or Wolfe would be placed on inactive status, and after 30 days on inactive status, she would be terminated from employment. Wolfe received another letter from Acts with a similar message on October 22, 2021. Wolfe did not receive the vaccine and was terminated from Acts' employment.

Plaintiff Katherine L. Howerin began working as a floor nurse for Acts in 2013. Howerin was promoted to the Director of Nursing position in February 2021. Howerin oversaw the clinical staff at WillowBrooke Court and managed all staff and incident reports. Howerin also implemented the COVID-19 policies. Howerin's religious exemption request was granted even though she received the flu vaccine the previous year. Howerin received the same October 7, 2021 letter as Sigley and Wolfe that rescinded the approval of her religious exemption request for the COVID-19 vaccine. Howerin was advised to begin the vaccine process by November 1,

2021 or be placed on inactive status. After 30 days on inactive status, Howerin would be fired, according to the letter. Howerin received a similar letter from Acts on October 22, 2021. Howerin did not receive the vaccine and was terminated from Acts' employment. At deposition, Howerin explained her objection to the COVID-19 was a general religious conviction against all vaccinations because she believes God is the ultimate healer and through prayer feels God convicted her to not receive vaccines.

## I.     Standard For Summary Judgment

Summary judgment is granted in a case when "there is no genuine dispute of material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is considered material when it could alter the outcome of the case. Zaben v. Air Products & Chemicals, Inc., 129 F.3d 1453, 1455 (11th Cir. 1997) (citing Anderson at 248).

Summary judgment functions to discard claims or defenses that are not adequately supported by the facts. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). One purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see if there is a genuine need for trial." Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e).

A genuine issue for trial is nonexistent when a reasonable jury would not be able to find for the nonmoving party based on the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp. 475 U.S. 574, 587 (citing First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)). Although the facts are viewed in the most favorable light to the nonmoving party, the nonmoving party bears the burden of designating specific facts to show that a genuine issue to be solved at trial exists. Id. The nonmoving party must establish more than doubt regarding the material facts to proceed to trial. Id. at 586 (citations omitted). An alleged factual dispute will likewise be

insufficient to establish a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Therefore, when the moving party meets their burden and the nonmoving party does not convincingly show a dispute of the facts, the motion for summary judgment shall be granted. Fed. R. Civ. P. 56(a). A motion for summary judgment is properly granted when the "pleadings, depositions, answers to interrogatories, and admissions on file" are considered and relied upon in the decision. Celotex, 477 U.S. at 324.

### I. Discussion

Plaintiffs allege one cause of action against Acts: the failure to reasonably accommodate their religious beliefs under Title VII. See 42 U.S.C. §2000e(j). Acts argues for summary judgment for three reasons: 1)Acts is a religious organization and not subject to liability for religious discrimination claims under Title VII; 2)Plaintiffs cannot establish their failure to accommodate claims because they did not hold sincere religious beliefs against the COVID-19 Vaccine; 3)Plaintiffs' claims fail because their requested accommodations posed an undue hardship.

#### A. The Religious Organization Exemption

The Religious Organization Exemption provides that Title VII "shall not apply to an employer with respect to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such [organization] of its activities." 42 U.S.C.A. § 2000e-1. In other words, "42 U.S.C. § 2000e–1, exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion." Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 329 (1987). Thus, the Religious Organization Exemption is a statutory exemption to Title VII claims.

Generally, federal courts classify statutory exemptions as affirmative defenses: "As far as the judicial precedents are concerned," federal courts have held as an affirmative defense matters in which "the plaintiff's claim falls within an exemption from statutory coverage." 5 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1271 (4th ed. 2024). And "an affirmative defense is a defense that does not seek to negate the elements of the plaintiff's claim but instead provides a basis for avoiding liability even if the elements of the plaintiff's claim are met." 1 Steven S. Gensler, Fed R. Civ. P., Rules and Commentary Rule 8 (2024). If the Religious Organization Exemption applies, that is exactly what it accomplishes—the avoidance of liability even if the elements of the plaintiff's claim are met.[2]

The failure to assert an affirmative defense in a responsive pleading typically results in a waiver of the defense. See Am. Nat'l Bank of Jacksonville v. FDIC, 710 F.2d 1528, 1537 (11th Cir. 1983). The Eleventh Circuit has "recognized, however, that a defendant does not waive an affirmative defense if the earlier omission from responsive pleadings does not prejudice the plaintiff." Edwards v. Fulton Cnty., Ga., 509 F. App'x 882, 887–88 (11th Cir. 2013) (citing Proctor v. Fluor Enters., Inc., 494 F.3d 1337, 1350 (11th Cir. 2007)). The Eleventh Circuit has "also concluded that an omission of an affirmative defense in responsive pleadings does not prejudice a plaintiff when the defendant first raises the defense in a pretrial motion or discussion and the subject matter of discovery suggests that the defendant will rely on the defense." Id. See also Sweet v. Sec'y, Dep't of Corrections, 467 F.3d 1311, 1321 n. 4 (11th Cir. 2006) (explaining that "it is settled that a plaintiff is not prejudiced by a defendant's failure to comply with Rule 8(c) if

---

[2] The Ninth Circuit explicitly classified the Religious Organization Exemption as an affirmative defense. Garcia v. Salvation Army, 918 F.3d 997, 1008–09 (9th Cir. 2019). The Eleventh Circuit has not directly addressed whether the Religious Organization Exemption is an affirmative defense.

10

the plaintiff is provided notice of the affirmative defense by some other means," such as the defendant's motion for summary judgment); Grant v. Preferred Res., Inc., 885 F.2d 795, 797–98 (11th Cir. 1989) (determining that although the defendant did not raise a statute-of-limitations defense in its responsive pleadings, the defendant put the plaintiff on notice that the defense would be relied upon because the defendant raised the defense in a motion for summary judgment filed one month before trial).[3]

Acts failed to plead the Religious Organization Exemption as an affirmative defense. However, there is no indication that Acts' failure to plead the exemption prejudiced Plaintiffs. Plaintiffs have not argued that the omission of the exemption in the pleadings was prejudicial. Moreover, Acts provided notice of the affirmative defense by raising it in its motion for summary judgment. Thus, the exemption has not been waived or forfeited.

### B. Acts' Status as a Religious Organization

Title VII does not define the qualifications for a religious organization under 42 U.S.C. § 2000e-1(a). Because of this, courts have looked at several different factors to determine whether

---

[3] The Ninth Circuit has also concluded that absent prejudice, the Religious Organization Exemption may be first raised at summary judgment. Garcia, 918 F.3d at 1008. There, even though the defendant failed to timely raise the exemption in the answer, the court concluded that it applied and foreclosed the Title VII claims. Id. at 1009. The court reasoned that there is "no prejudice to a plaintiff where an 'affirmative defense would have been dispositive' if asserted 'when the action was filed.'" Id. at 1008 (quoting Owens v. Kaiser Found. Health Plan, Inc., 244 F.3d 708, 713 (9th Cir. 2001)). "Rather, a party must point to a 'tangible way in which it was prejudiced by the delay.'" Id. at 1009 (quoting Ledo Fin. Corp. v. Summers, 122 F.3d 825, 827 (9th Cir. 1997)). "The only prejudice [Plaintiff] asserts is that she was denied discovery to test the Salvation Army's defense." Id. The court explained that there is no prejudice because (1) Plaintiff was familiar with the Salvation Army's religious focus as a former member and (2) the Salvation Army's nonprofit status and reports were public. Id.

an organization is a religious organization. The Eleventh Circuit has not addressed the definition of a religious organization since Killinger v. Samford University, 113 F.3d 196 (11th Cir. 1997) when it determined Samford University was a "religious…educational institution" under Section 702(a) of Title VII. Id. at 198. In Killinger, the Eleventh Circuit evaluated the following factors: (1) whether Samford University produced a "secular" product, (2) whether Samford was founded by a religious entity, (3) whether the Board of Trustees adhered to a certain religious belief, (4) whether Samford received funding from a religious organization, (5) whether employees were required to sign off on a mission statement, and (6) how the Internal Revenue Service categorized the University. Id. at 198-99.

In LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 226 (3d Cir. 2007), the Third Circuit combined the Killinger factors with other factors from the Fifth and Ninth Circuits' analyses[4] of religious entities under Section 702(a) of Title VII, to create a fuller analysis for evaluating a religious status of an organization. Since the Eleventh Circuit has not addressed defining a religious entity in almost 30 years, the Court finds that the LeBoon factors are the most informative for evaluating whether Acts is a religious entity exempt from religious discrimination under 42 U.S.C. § 2000e-1(a).

The LeBoon factors are:

> (1) whether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or sectarian, (7) whether the entity regularly includes prayer or other forms of worship in its activities, (8)

---

[4] See EEOC v. Kamehameha Schools/Bishop Estate, 990 F.2d 458 (9th Cir. 1993), as amended on denial of reh'g (May 10, 1993) and EEOC v. Mississippi College, 626 F.2d 477 (5th Cir. 1980).

whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and (9) whether its membership is made up by coreligionists.

Id. (citations omitted).

First, it is undisputed that Acts is a nonprofit organization founded upon Christian principles. Plaintiffs state this fact in their Complaint: "[Acts] is a 501(c)(3) charitable organization that was founded on general Christian ideals. And Acts Retirement-Life Communities website states, '[w]ith a vision founded in faith and guided by a commitment to integrity and Loving-Kindness, Acts has established an unsurpassed reputation for strength and stability in the senior retirement living industry.'" (Doc. 9 at p. 19).

Despite Plaintiffs conceding that Acts is a nonprofit, Plaintiffs argue that the Court should consider the fact that Acts participates in the exchange of goods or services for money that exceeds nominal amounts, according to Acts' tax-exempt filings with the IRS. (Doc. 106 at p. 13). Plaintiffs also highlight Acts' finances in 2021 and the amount its senior staff made as argument that Acts should not be afforded the Religious Organization Exemption. (Id.). However, neither of these arguments appear to be relevant to the analysis of the LeBoon factors. In Killinger, the Eleventh Circuit did not consider the amount of money Samford University accrued in a year or the salary of its highest-ranking staff in their analysis. Killinger, 113 F.3d at 199. Instead, the Eleventh Circuit looked at how the IRS recognized Samford University as a religious educational institution. Id. The very documents Plaintiffs reference as the basis of this argument are Acts' IRS tax exempt filings as a *nonprofit* organization. (Doc. 106 at p. 13). An organization's structure "as a nonprofit provides strong evidence that its purpose is purely nonpecuniary." Spencer v. World Vision, Inc., 633 F.3d 723, 734-35 (9th Cir. 2011). Further, courts have found that a nonprofit entity is not barred from compensating employees at the

13

market rate. Id. at 734. It is uncontested that Acts is a nonprofit entity, so Acts meets the first LeBoon factor.

The second LeBoon factor is whether the organization produces a secular product. Plaintiff argues this factor weighs against Acts by claiming Acts produces a wholly secular product of retirement services, sets itself out to the public as producing that product, and that Acts' religious activities are optional. (Doc. 106 at p. 10-11). The Court disagrees.

Section 702 of Title VII exempts all activities of the religious organization, including secular activities. See Amos, 483 U.S. at 339 (Congress acted with a legitimate purpose in expanding the § 702 exemption to cover all activities of religious employers.). In Amos, the Court explained that the purpose of this exemption was "to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." Id. at 335. The Court in Amos indicated that this interference might arise from "a judge [who]would not understand its religious tenets and sense of mission." Id. at 336.

Acts considers providing health care to the elderly to be a biblical requirement of Christianity. In fact, Acts even cites the specific scripture, Acts 6:1-6, in their employee handbook to support this view. It is not for this Court to redefine that mission as secular. And other courts have recognized that medical treatment, like the kind Acts provides to its residents, is an activity that may be motivated by a religious purpose. Conway v. Mercy Hosp. St. Louis, No. 4:22-CV-1113 RLW, 2024 WL 551892 *5 (E.D. Mo. Feb. 12, 2024) (citing Boydston v. Mercy Hosp. Ardmore, Inc., No. CIV-18-444-G, 2020 WL 1448112 *5 (W.D. Okla. Mar. 25, 2020)). Accordingly, this factor weight in Acts' favor.

LeBoon's third factor – whether the entity's core documents contain a religious purpose – weighs in favor of Acts. The doctrinal statement declares Acts will adhere to the Holy Scriptures

14

of both the Old and New Testaments and to the Apostles' Creed. This doctrinal statement establishes a religious purpose and is included in Acts' bylaws. Acts' Board of Directors must also support the doctrinal statement outlined in the bylaws and must live a "life according to their consciences and the Word of God, the Bible…" (Doc. 98-4).

Plaintiffs only rebuttal of this factor is that they did not timely receive the bylaws. The Court does not find this objection meritorious. See supra note 1. Thus, Acts meets the third LeBoon factor as its pertinent documents clearly set forth a religious purpose.

The fourth factor is whether Acts is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue. The fifth factor is whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees. These factors will be analyzed together.

Acts was founded by the Church of the Open Door so that the Church could care for its aging members. The organization was named "Acts" in reference to the Book of Acts in the Bible where caring for widows is mentioned in Acts 6:1-6. Like Samford University, Acts was started by a religious entity but is no longer controlled by that entity. See Killinger, 113 F.3d at 199 ("Samford was founded as a "theological" institution in 1841 by the Alabama Baptist State Convention (the "Convention").") And like Samford University, Acts' bylaws require Acts' Board of Directors to continue to conform to the founding principles and live their lives in accordance with the Bible. See Id. ("While Samford recently amended its charter to remove the Convention's power to elect the school's trustees, its trustees are now, must be, and always have been (with one historical exception) Baptist.") Thus, although Acts is no longer affiliated with a church, it maintains the requirement that the organization and its leader ascribe to the biblical

principles articulated in the bylaws and its mission statement.  However, unlike Samford University, it does not receive financial support from the founding church.

Plaintiffs point out that not only is Acts is no longer affiliated with a church, but Acts publicly states on its website that it is not affiliated with any denomination.  But this is not determinative.  In LeBoon, the Court found that Lancaster Jewish Community Center Association was a religious organization even though the Center did not identify with the local synagogues or Jewish organizations that supported them in fundraising. LeBoon, 503 F.3d at 227.   So, even though Acts no longer affiliates with a church and does not receive funding from the church, this factor weighs slightly in Acts' favor since the organization was formed out of a church and the management continues the same Christian mission today.

The sixth factor is whether the Acts holds itself out to the public as secular or sectarian.  As previously delineated, it is undisputed that Acts holds itself out as an organization whose mission is based on Christian principles.  Although Plaintiffs recognize Acts' basis in Christianity, Plaintiffs contend that the Loving-Kindness charge given by Acts to its employees is more of a moral duty than a religious one.

The fact that a religious duty might also be a moral duty does not diminish the religious aspect of it.  See LeBoon at 227 (The Jewish values espoused by the LJCC were also universal values. These values included healing the world, doing the right thing, and tolerance of other faiths.). The Loving-Kindness statement is clearly rooted in religious duty: "Acts is committed to following God's directives to care for seniors and, in so doing, glorifying Him through intent, purpose and righteous justice." (Doc. 98-3 at p. 3). Thus, the sixth LeBoon factor weighs in Acts favor.

As to the seventh factor, Acts regularly includes prayer and worship services in its activities. Acts has a chaplain at each of its communities that visits and counsels residents, leads Bible studies and provides worship services for the residents. The chaplains also serve as a pastoral figure for Acts employees. Acts also routinely prays during each of its staff meetings.

Plaintiffs do not specifically address this factor but instead argue that Acts cannot benefit from the Title VII ministerial exemption because it does not operate as a church. The ministerial exception is not the exemption relevant to this analysis and is a separate issue from the Religious Organization Exemption. Because prayer and time of worship are a regular part of Acts' activities, the seventh factor weighs in Acts' favor.

The eighth LeBoon factor of whether it includes religious instruction in its curriculum is not applicable since Acts is not an educational institution.

The last factor is whether the entity's membership is made up by coreligionists. Acts does not have "members" so it would appear that this factor is not relevant. However, to the extent this factor relates to the makeup of the workforce, Plaintiffs claim that since Acts does not discriminate based on religion in hiring employees or accepting residents, that this factor weighs against Acts.

In Killinger, the Eleventh Circuit rejected the argument that rigid sectarianism is a requirement for the religious exemption. Killinger, 113 F.3d at 199-200 ("[There is] no requirement that a religious ... institution engage in a strict policy of religious discrimination—such as always preferring Baptists in employment decisions—to be entitled to the exemption.") And as pointed out in LeBoon, "the organization need not enforce an across-the-board policy of hiring only coreligionists." LeBoon, 503 F.3d at 230.

17

In sum, Acts was founded by a church as a Christian organization to serve the health and spiritual needs of the elderly. And although Acts is no longer financially supported or managed by the founding church, Acts adheres to the original Christian mission in word and in practice. Moreover, Acts requires its directors and employees to adhere to this mission in the addressing the spiritual and health needs of its residents. The law declares that such an organization is exempt from religious discrimination claims under Title VII.

## II.      Conclusion

Accordingly, it is **ORDERED** that Acts' Motion for Summary Judgment is **GRANTED**, Plaintiffs' Motion for Summary Judgment is **DENIED**, and Plaintiffs' Motion to Strike is **DENIED.** Final judgment will be entered as a separate document pursuant to Fed. R. Civ. P. 58(a).

**DONE** and **ORDERED** this the **26th** day of **February 2025.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**